UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| ROBIN GILL, | |
| Plaintiff, | |
| v. | Civil Action No. |
| THATCHER BROOK CENTER and JOB PLACEMENT SERVICE, INC. | |
| Defendants. | |

**COMPLAINT**
**INJUNCTIVE RELIEF REQUESTED**

NOW COMES the Plaintiff, Robin Gill ("Gill"), by and through undersigned counsel, and complains against the Defendants, Thatcher Brook Center ("TBC") and Job Placement Service, Inc. as follows:

JURISDICTION AND PARTIES

1.       This action arises under the Maine Human Rights Act ("MHRA"), 5 M.R.S. §§ 4551 et seq., the Maine Whistleblowers' Protection Act ("MWPA"), 26 M.R.S. §§ 831 *et seq.*, the Maine Cessation of Employment law ("MCE"), 26 M.R.S. §626, and the federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.*

2.       Thatcher Brook Center ("TBC") is a Maine nonprofit corporation with its principal place of business in Maine. TBC was incorporated in September 2016.

3.       Job Placement Service, Inc. ("JPS") is a Maine business corporation with its principal place of business in Maine. JPS was incorporated in December 1995.

4.       JPS was administratively dissolved in August 2017 due to failure to file an annual report.

1

5.      TBC and JPS each employed about 15 employees in 2016 and 2017.

6.      At all relevant times, TBC and JPS operated as a joint employer.

7.      At all relevant times TBC and JPS operated as an integrated enterprise.  Upon information and belief, these Defendants have common ownership and management; they exercise centralized control of labor relations; and their operations are interrelated.

8.      Among other things, Lucinda Clarke ("Clarke") is the President of JPS as well as a Director, the Registered Agent, and the Authorizing Party of TBC. The shareholders of JPS are Clarke's sons, Theo and Noah Brossman.

9.      Upon information and belief, Vocational Rehabilitation and MaineCare funds were moved back and forth between bank accounts in the name of JPS and TBC.

10.      In early 2017, Clarke and Theo Brossman insisted that TBC sign an indefinite NNN lease on a building their family owned. The lease required the nonprofit to pay $3,000 per month in rent in addition to any and all bills, repairs, and taxes on the rapidly declining building. This amount was well above market value in Biddeford, Maine.

11.      At various times, Gill and other employees were paid wages by TBC or JPS.

12.      Gill was a joint employee of TBC and JPS.  As a matter of economic reality, her job was dependent on both employers and they shared control and supervision of her work and the entity that paid Gill would change between TBC and JPS.

13.      This Court has subject matter jurisdiction over Gill's federal and state claims pursuant to 28 U.S.C. §§ 1331and 1367.

14.      On November 27, 2017, Gill filed a timely Complaint of Discrimination against TBC alleging whistleblower retaliation with the Maine Human Rights Commission ("MHRC").

15.     On December 10, 2018, the MHRC issued a Notice of Right to Sue with respect to Gill's MWPA claim.

16.     Gill has exhausted her administrative remedies with respect to all claims requiring administrative exhaustion set forth in this Complaint.

17.     The majority of the discriminatory practices alleged herein were committed within the State of Maine, primarily in York County.

18.     Defendants are subject to the jurisdiction of this Court.

19.     This action properly lies in the District of Maine pursuant to 28 U.S.C. § 1391(b) because the claims arose in this judicial district.

20.     At all material times, Defendants were Plaintiff's employer within the meaning of the FCA, MHRA, MWPA, and the MCE law.

<u>FACTUAL ALLEGATIONS</u>

21.     Thatcher Brook Center is a family-owned and operated business that provides community-based services to individuals with intellectual disabilities.

22.     Clarke's then-husband, David Brossman, founded Saco Island School and JPS in 1992. When David Brossman passed away in 2012, he left the for-profit businesses to their sons, Theo and Noah Brossman.

23.     After David Brossman died, Clarke managed the businesses as the Executive Director.

24.     Gill was hired in August 2016 as a Direct Support Professional ("DSP") in the JPS Day Program.

25.     Clarke was heavily involved in interviewing and hiring Gill.

26.     TBC was incorporated as a non-profit in September 2016.

27.     About one month after she was hired, Gill was promoted to Lead DSP.

28.     For a period of about eight months 2016-2017, Clarke stepped away from operating the business.

29.     Jennifer Wilbur ("Wilbur") served as the Executive Director when Clarke left.

30.     Gill assisted Wilbur in creating a plan for client transportation, thus creating a new income stream for the company, and taking on more responsibility for herself.

31.     On April 17, 2017, Wilbur promoted Gill to Assistant Day Program Manager.

32.     Gill's base compensation was $32,000 per year.

33.     Gill was eligible for, and received, a $200 per month non-taxable medical reimbursement.

34.     In about mid-May 2017, Clarke returned to TBC as the Executive Director and took charge of day to day operations. Clarke fired two managers, accusing them of attempting a corporate take-over.

35.     In May 2017, Clarke promoted Gill to Day Program Manager.

36.     In August 2017, Clarke gave Gill a pay raise to $35,000 per year and continued to pay her $200 per month as a tax-free medical reimbursement.

37.     Shortly thereafter, Gill attended an event held by Clarke, along with her husband who is legally blind. The event featured holistic activities including massages and Reiki.

38.     As her husband has difficulty navigating, Gill stayed close to his side in order to ensure safety for all.

39.     Clarke approached Gill and her husband upon their arrival and stated that the raise she had given Gill one week prior was not adequate. Clarke told Gill that the board felt that Gill deserved more compensation for the amazing job she was doing.

40.     Clarke told Gill that she would receive $1000 more a year for her outstanding performance.

41.     Clarke instructed Gill to meet the board and thank them for the raise, which she did.

42.     Gill then mingled and socialized with the other guests including a prospective new client and his mother.

43.     Defendants billed and received reimbursement for services provided to consumers under MaineCare Benefits Manual, ch. 11 § 29.

44.     Defendants, in performance of their contracts with the State of Maine, were to provide services by persons who were certified and/or qualified pursuant to MaineCare Benefits Manual, ch. 11, § 29.

45.     Qualifications of Defendants' employees was a precondition for submitting invoices to, and receiving payments from, the State of Maine.

46.     Defendants, in performance of their contracts with the State of Maine, were to conduct background checks, motor vehicle records checks, and auto insurance checks on employees who worked with consumers pursuant to MaineCare Benefits Manual, ch. 11, § 29.

47.     Due diligence in conducting appropriate checks on employees was a precondition for submitting invoices to, and receiving payments from, the State of Maine.

48.     Defendants, in performance of their contracts with the State of Maine, were required to provide clients with the freedom of choice with regard to programming, pursuant to MaineCare Benefits Manual, ch. 11, § 29.

49.     Providing freedom of choice in programing to clients was a precondition for submitting invoices to, and receiving payments from, the State of Maine.

50.     Providing clients with programming that assisted the client in meeting goals set out in their person centered plans was a precondition for submitting invoices to, and receiving payments from, the State of Maine.

51.     During Gill's employment, she had personal knowledge that Clarke and TBC were violating MaineCare regulations including:

- They were not performing background checks on applicants;

- Staff were providing DSP level services without DSP certification;

- Defendants were billing and receiving payment from MaineCare for services provided by unqualified employees;

- Defendants were not conducting motor vehicle record checks on employees who transported consumers in vehicles;

- Defendants were not verifying that employees who transported consumers in vehicles had auto insurance.

- Defendants were not allowing clients' freedom of choice with regard to programming.

- Defendants were not providing clients with programming that assisted the client in meeting goals set out in their person centered plans.

52.     During her employment, Gill witnessed Clarke violating the rights of TBC's clients.

53.     Gill also witnessed Clarke violating local building codes.

54.     Gill spoke up and reported to Clarke several times that she was violating clients' rights, exploiting clients, and violating local building codes.

55. Gill was a mandated reporter, that is, a person who is required to report suspected abuse, neglect or exploitation to the Maine Department of Health and Human Services (DHHS).

56. On April 24, 2017, Gill filled out a City of Biddeford, Office of Code Enforcement "Violation Complaint Form" about unsafe conditions at 638 Elm Street, Biddeford where TBC was located.

57. At the time, Jennifer Wilbur ("Wilbur") was managing TBC.

58. Gill was one of several staff members who made code violation complaints at the request of Wilbur. They thought that TBC would be moved to a different location shortly after they complained, but that did not happen.

59. Clarke took over as manager of TBC in about mid-May 2017.

60. In May and early June 2017, Gill reported to Clarke regarding the failure to conduct background checks, providing and billing for DSP services for employees that did not have DSP training, and failure to conduct motor vehicle record checks and insurance verification for employees who transported clients.  Gill also reported her opposition to these violations of the rules and preconditions for payment under MaineCare.

61. On June 3, 2017, Scott Welton ("Welton"), Life Safety Inspector for the Biddeford Code Enforcement Office, conducted a full inspection of 638 Elm Street where TBC is located.

62. On July 7, 2017, Welton issued a Notice of Violation to the owner of 638 Elm Street.

63. On August 9, 2017, after Gill had worked for Clarke for about three months, Clarke issued Gill a very positive Employee Performance Review.

64.     The Employee Performance Review form had three rating levels: "Highly Satisfactory" (HS), "Satisfactory" (S), "Improved" (I) or "Unsatisfactory" (U).

65.     Clarke rated Gill as "HS," "S" or "I" in all categories.

66.     On August 31, 2017, Welton inspected TBC again and found that several of the violations had not been corrected. He also found additional violations that did not exist or were not detected during the earlier inspection.

67.     Welton notified Clarke of the continuing and new violations in an email dated September 1, 2017.

68.     A copy of Welton's email was sent to Brian McKnight, Program Administrator, DHHS Office of Aging and Disability Services.

69.     Upon information and belief, Clarke was a direct sales representative for an aromatherapy/essential oils company and earned money from selling essential oils.

70.     Gill became concerned that Clarke was requiring TBC clients to participate in essential oils parties and massage sessions.

71.     Gill became concerned that having clients smell and taste essential oils was potentially harmful. For example, no consideration was given to the interaction between the essential oils and the clients' medications.

72.     Gill became concerned that Clarke was exploiting the clients for personal gain.

73.     During a staff meeting on Tuesday, September 5, 2017, Gill told Clarke that she did not agree that Clarke could make essential oils and massage mandatory for TBC clients because clients had the right to choose what programs to attend.

74.     Gill told Clarke that there would be clients who were unhappy about it being mandatory and would not want to participate.

75.     Employees who were present at the staff meeting include Craig Lewin ("Lewin"), Doug Bailey, Christopher Wayland, and Lauren Corbett.

76.     At a management meeting on Wednesday, September 6, 2017, Gill again expressed concerns to Clarke about not giving TBC clients freedom of choice and making holistic activities mandatory for clients.

77.     Office Manager Erika Penrod ("Penrod") was at that meeting along with Gill and Clarke.

78.     On Tuesday, September 12, 2017, Gill received an email from Marsha Thomas at ("Thomas") DHHS.

79.     In her email, Thomas said that DHHS might be putting a hold on TBC receiving new authorizations and renewing current authorizations because of the unsafe and illegal condition of TBC's building.

80.     Gill passed that information along to Clarke.

81.     Clarke sent an email to Thomas directly and told Thomas that there were never any major problems with the building, and that issues had already been addressed, which was untrue.

82.      The following day, September 13, 2017, Clarke sent Welton an email with her plan of correction for the building.

83.     A copy of Clarke's email was sent to DHHS and to Penrod.

84.     On Thursday, September 14, 2017, Clarke violated a client's rights by forcing him to pour out a soda he had purchased for himself. Clarke brought the client into her office and called his mother. Lewin and Gill were in the office when this happened.

85.     Clarke told the client that he would be suspended if he did not pour out the soda. After Clarke got off the phone, Gill told Clarke that her actions were completely inappropriate.

86.     Clarke admitted to the MHRC that she should have allowed the client to keep his soda.

87.     At a staff meeting on Friday, September 15, 2017, Clarke and another representative of the essential oils company encouraged employees to smell and taste essential oils and gave employees brochures about the product.

88.     After the staff meeting, Clarke held an essential oils party with TBC's clients. Another company representative attended that party as well.  Consumers and their guardians were given brochures about the product.

89.     Two clients refused to participate in the essential oil party. The clients appeared upset and indicated that they were very upset that programing that they wanted (like woodworking, life skills, etc.) was cancelled and replaced with mandatory programing.

90.     One of them stood outside in the rain, crying.

91.     Gill took these clients out in the community instead of forcing them to attend the party, even though Clarke had said that the party was mandatory.

92.     Gill's conduct amounted to refusing an unlawful directive issued by Clarke.

93.     After the clients left TBC that day, Clarke met with Gill, Lewin, and Penrod.

94.     At that meeting, Gill expressed concerns about Clarke changing the programming and not providing clients with choices for other opportunities in the community.

95.     Clarke insisted that clients participate in holistic programming. Clarke told Gill that she was wrong, that she was not performing her job, and that she needed to convince clients to participate in holistic programing.

96.     Gill told Clarke that her actions violated the clients' rights because they had the right to choose their own programs.

97.     Clarke told Gill, "It's my program and I'll do what I want. You need to support me."

98.     On Friday, September 15, 2017, Welton posted Legal Notices that the basement, porch/fire escape, and second floor of 638 Elm Street were off limits.

99.     The Legal Notices said that no one was to occupy those portions of the building until a Certificate of Occupancy was issued by the Building Inspector and that it was illegal to act contrary to the notice.

100.     Clarke violated the Legal Notice and held meetings with employees on the second floor and let clients go down into the basement.

101.     Gill passed that information along to an employee, Danielle Duckworth ("Duckworth"), and she reported it to the Biddeford Code Enforcement Office.

102.     On September 15, 2017, DHHS notified the Biddeford Code Enforcement Office that Clarke was allowing clients on the second floor.

103.     In a text message on September 18, 2017, Clarke told Gill to make sure that no one talks about "our building issues," including with a client's case manager.

104.     Clarke's text reflected an effort to conceal unsafe and illegal conduct.

105.     Gill refused to go along with Clarke. On Wednesday, September 20, 2017, Clarke texted Gill, "We can go in the basement now." Gill replied, "Not as long as the sign is up."

106.     Gill's conduct amounted to refusing an unlawful directive issued by Clarke.

107.     On Wednesday, September 20, 2017, Gill was asked to meet with Clarke.

108.     Gill had asked that Lewin be present for the meeting but Clarke said no, so Gill brought Duckworth to the meeting.

109.     Clarke began the meeting by stating she was concerned about Gill being stressed out due to Gill's other job.

110.     Gill replied that her stress has nothing to do with her other job.

111.     Gill confronted Clarke about how Clarke's demeanor toward Gill had changed after Gill told Clarke about DHHS putting a hold on TBC receiving new authorizations and renewing current authorizations.

112.     Clarke said she didn't know what Gill was talking about.

113.     Gill reminded Clarke that she (Gill) had passed along to her what Thomas had said about authorizations for TBC being revoked by DHHS.

114.     Gill went on to explain that her stress was also coming from the changes Clarke was making in programming, the concerns that Gill had already expressed at the staff meeting on September 5, 2017 as well as during the management meeting on September 6, 2017.

115.     In those meetings Gill had voiced concerns that the program changes violated clients' rights.

116.     Gill added that she had always been taught to protect client rights and that she had attended many trainings and meetings on this subject.

117.     Gill explained again that client rights were being violated by making holistic essential oil and massage days mandatory and not providing other choices for clients.

118.     Gill said that she did not mind that holistic essential oil and massage days were offered but they should be put on the calendar as an option that clients could choose to participate in, or not.

119.    Gill also told Clarke that she (Clarke) recently violated clients' rights when she barred staff from bringing clients into stores.

120.    Clarke responded that she didn't want staff and clients just hanging out at stores, and said that she knew of other programs that take clients to stores just to waste time.

121.    Gill said that when her staff took clients to stores it was typically to work on goals such as budgeting, money management, nutrition and performing transactions as stated in clients' Person-Centered Plan goals.

122.    Gill told Clarke that she had heard from other staff that Clarke had spoken negatively about her (Gill) and that Clarke had offered Gill's position as Day Program Manager to other employees.

123.    Duckworth stated that she heard on many different occasions that Clarke discussed her (Duckworth) negatively to other employees.

124.    Clarke stated that she didn't understand why Gill was "playing the victim" and making Clarke out to be an "ogre."

125.    Clarke stated that she was sorry for the way that Gill felt.

126.    Gill restated that freedom of choice was the law for clients and that they needed to uphold its clients' rights.

127.    Clarke said she wanted to incorporate holistic health into the center and wanted Gill to be on board. Gill restated that she was not opposed to holistic health, however, it needed to be a choice.

128.    Gill also said that essential oils can trigger migraines in some people, which was a reported concern about health and safety.

129.    Gill told Clarke that she lives a healthy lifestyle and would support any attempt to assist TBC's clients in leading healthy lifestyles.

130.    Clarke asked Gill if she could support her (Clarke) in providing holistic programming in the day program. Gill said yes, she could, but that it needed to be the clients' choice.

131.    Clarke asked Gill again if she could continue to support her. Gill told Clarke that she would need to think everything over.

132.    Gill's refusal to tell Clarke that she would assist Clarke in violating clients' rights was a refusal of an unlawful directive.

133.    In her submission to the MHRC, Clarke denied that any client was ever forced to participate in an essential oils program or other holistic activity. This is incorrect.

134.    At the time of these events, no clients of the day program had a Person-Centered Plan that included holistic or essential oil goals to work towards.

135.    Requiring clients to attend holistic programs that were not part of the clients' Person-Centered Plan, and then billing MaineCare for the services provided, violated the FCA.

136.    Additionally, on the day when the holistic and essential oils activities were scheduled, all other activities were cancelled.

137.    On Thursday, September 21, 2017, Gill sent and received numerous phone calls with State agencies and the Town of Biddeford regarding clients' rights violations, code violations, and false claims:

| 9/21/17 | 8:34 AM | Gill called the Office of Aging and Disability and left voicemail for James Hathaway Regional Supervisor. |
| | 9:03 AM | Gill contacted Biddeford Code Enforcement about clients entering posted unsafe areas. Gill was told that an investigator would be notified. |

14

| | 9:15 AM | Gill spoke to Bryan Gordon, Caseworker Supervisor with the Office of Aging and Disability. She reported that Clarke was violating clients' rights and ignoring posted signs from code enforcement. |
|---|---|---|
| | 11:20 AM | Gill called the Reportable Event hotline for Abuse Neglect and Exploitation for Adult Protective Services and reported that Clarke was violating clients' rights and ignoring posted signs from code enforcement. |
| | 12:59 PM | Gill spoke to someone with Adult Protective Services about clients' rights, code enforcement violations, and false claims for billing MaineCare for services provided by untrained DSPs. |

138.    At 6:51 AM on September 22, 2017, Clarke texted Gill the following message:

"Morning! Will you be in today? It would be appreciated to get day and Logisticare billing done. I will not be in but Erika is there. I would like to suggest that you take a week off next week. You have a lot of time off to take. ☺"

139.    As the day went on, Gill continued to send and received numerous phone calls

with DHHS:

| 9/22/17 | 11:33 AM | Gill received voice mail from Office of Aging and Disability Regional Supervisor Peter Jay. He asked for a list of clients that TBC serves for community programming and vocational rehabilitation. |
|---|---|---|
| | 12:00 PM | Gill played the voicemail to Penrod. Penrod said that she would get that information to Jay and make Clarke aware of the request. |
| | 12:30 PM | Gill called Jay to let him know that she did not have the information that he needed but that she had relayed the request to Ms. Penrod who assured Gill that she would respond ASAP. |
| | 4:03 PM | Gill spoke to Zach Kalisher, an investigator working with Bryan Gordon, Caseworker Supervisor, Office of Aging and Disability, and reported Clarke's violations of clients' rights. |

140.    At 1:10 PM, Gill received a text message from Clarke, who wrote:

"…On the subject of vacation, you have four weeks of accrued time. I would appreciate you taking next week and the week w your husband in October. You are grandfathered but we can't allow anyone to have more than three weeks accrued. ..."

141.    Later that day, at 4:17 PM, Clarke wrote another text that read:

"You work harder and better than anyone I know. We all have to hear some feedback at times. My feedback all summer has been to take a

vacation. ☺ Let's chill and try to find some peace, relaxation and joy. I wish you some rest. We have many good things going on. …"

142.    At Clarke's request, Gill arranged for staff to cover for her and took the next week off.

143.    On Monday, September 25, 2017 staff member Michelle Dion reported to Gill via text message that a woman from DHHS had stopped in for an impromptu visit and asked for Gill specifically and did not wish to speak to Clarke at all.

144.    On Tuesday, September 26, 2017, Gill heard from a co-worker that Clarke was planning to fire her.

145.    On Wednesday, September 27, 2017, at 4:38 PM, Clarke sent Gill a letter as an attachment to an email and text message, terminating her employment.

146.    In her letter, which was dated September 26, 2017, Clarke claimed that she had "grave concerns" with Gill's job performance, particularly in the last three or four weeks. Clarke wrote that she intended to put Gill on a performance improvement plan and to give her "a chance to correct things" but that "more has come to light in last week that I cannot ignore."

147.    Clarke cited two concerns about Gill's job performance: (a) billing to Logisticare, and (b) Gill's efforts to put together a residential program.

148.    Clarke mischaracterized both issues.

149.    **Billing to Logisticare***:* Clarke wrote: "Most urgently, your billing to Logisticare which is critical to the cash flow of this company has been done incorrectly on a consistent basis from its inception. Most recently, the August billing was rejected because it was not signed once, was still not tended to and signed by you so once again, we did not receive crucial income."

150.    Logisticare is a program that allows agencies such as TBC to receive reimbursement for transporting consumers to and from necessary services.

16

151.    The forms and processes to receive reimbursement are cumbersome and complicated.

152.    At no time did Clarke express dissatisfaction with Gill's performance relative to these billings.

153.    Approximately one month before the August billing referenced in Gill's termination letter, Clarke met with Gill and they modified the billing process.

154.    The new process was in effect for the August billing.

155.    Gill's role in the new process was to review the forms to ensure that they had provided all transportation for which they were billing.

156.    Penrod's role was to make sure that all necessary signatures were present, all names were spelled correctly, and the forms were ready to go to Logisticare.

157.    In August 2017, the forms were submitted twice without the signatures of some of the van drivers. Reimbursement was not made without their signatures.

158.    Gill fulfilled her obligations both times the August bill was submitted.

159.    Additionally, after the billing was rejected the first time, Gill met with Penrod to remind her to obtain the missing signatures before submitting the forms again.

160.    This stated reason for termination had no basis in fact.

161.    Clarke said nothing about Gill's handling of Logisticare in her response to Gill's complaint of discrimination to the MHRC.

162.    **Putting together a residential program:** Clarke wrote: "You attempted to put together a residential program using your son's residence as a home. I told you repeatedly that I could not assist with this process this summer due to time constraints but that I knew that we needed a license. You kept at this process and in the end, of course we needed a license. While I

approved of this endeavor, and I know that you thought that you were helping both the company and your son, you did not see crucial aspects of licensure that we found in a few minutes' time upon investigation. This cost valuable time and money."

163.    Clarke's claim that Gill's actions cost her or TBC valuable time and money are inaccurate.

164.    First, the effort began in response to Clarke's stated desire to generate more income for TBC. Clarke initiated the effort and instructed Gill to "make it happen."

165.    It is true that Clarke did not assist Gill in the effort; whenever Gill approached her, Clarke would repeat "make it happen."

166.    Clarke never expressed reservations about the effort. In fact, she offered an employee a position running the residential program as soon as it opened.

167.    At a staff meeting, Clarke informed everyone that TBC would soon be offering residential services.

168.    The staff identified a prospective client from a referral by the State of Maine and Gill began an effort to evaluate his appropriateness for their services.

169.    While Gill was searching for an appropriate site for the program, an apartment in Gill's son's home became available. (Her son had rented the apartment for years.) Gill talked with her son about making the apartment available to TBC. He agreed to do so and kept the apartment open for two months at TBC's request.

170.    Gill showed the apartment to the prospective client as part of the evaluation process. After the showing, Clarke asked Gill to let the prospective client move in even though they had not received authorization from the State.

171.     Additionally, Clarke asked Gill to have two of Gill's co-workers from a second job come for interviews. Clarke told the applicants that she was going to employ them even though Gill told her to wait until TBC had secured approval for the program.

172.     Gill fully discussed with Clarke the actual or perceived conflict of interest involved with housing a client in an apartment owned by Gill's son. Clarke encouraged Gill to continue to work with her son and expressed gratitude about his willingness to keep the apartment open.

173.     As soon as TBC dropped its effort to establish a residential program, Gill's son offered the apartment on the open market and it rented within days.

174.     With regard to the statement in Clarke's statement that "we needed a license," no license was ever required.

175.     TBC only needed to obtain State approval to provide services in a private residence in accordance with State regulations.

176.     Ultimately, the State did not agree to allow TBC to provide the services.

177.     Gill was told by the case worker for the prospective client that the reason permission was withheld was because of DHHS's concerns about the quality of services the agency already provided and the agency's reputation.

178.     Finally, Gill is unaware of any financial expenditure related to this venture. The work she performed to "make it happen" was in addition to her existing duties. No duties were removed from Gill's workload because of this effort.

179.     This stated reason for termination has no basis in fact.

180.     Clarke said nothing about the unsuccessful residential care program in her response to the complaint of discrimination filed with the MHRC.

181.    **"More came to light in the last week" refers to Gill's protected activity:**
During Gill's meeting with Clarke on September 20, 2017, Gill expressed to Clarke her belief
that Clarke was violating clients' rights by making certain programs mandatory instead of by
choice.

182.    The meeting ended with Clarke demanding to know if Gill was willing to
"support" her.

183.    Gill refused to comply with Clarke's unlawful directive during that meeting.

184.    In her letter of termination, Clarke described the issue that "came to light in the
last week" as follows:

> "This past week, you were asked to my office to discuss your performance and issues
> that you seemed to be having at the center. Every time I entered the room you
> averted your eyes and left which is not behavior expected from a manager. When
> you finally came to my office you had another, junior employee by your side
> attempting to enter our meeting. When I asserted that this was unacceptable to me,
> you came back two hours later with another employee stating that you had a right to
> have a friend with you in my meeting. This right does not exist in any Human
> Resources policy. The fact that you involved still another junior staff in a managerial
> issue is completely unacceptable. Since then, you have not been able to speak to me
> in person, or by phone about anything using only text to communicate. I hope that
> you see, I cannot run a business with something like this going on."

185.    It is not plausible that what bothered Clarke about the meeting so much that she
had to fire Gill was her request that a co-worker attend the meeting as a witness.

186.    The negative things that Clarke had to say about Gill on September 27, 2017 are
at odds with the text sent by Clarke to Gill on September 22, 2017 encouraging Gill to take
vacation time off, to "chill and try to find some peace, relaxation and joy," and telling Gill that
"[y]ou work harder and better than anyone I know."

187.    **Two jobs:** The termination letter mentioned that Clarke also objected to Gill
working two full time jobs. Gill discussed that issue with Clarke when they met on September

20, 2017 when Clarke told Gill that she seemed stressed because of her second job. Gill explained to Clarke that the source of her stress was that Clarke was violating clients' rights.

188.    Clarke's purpose in meeting with Gill on September 20, 2017 was to try to get her to stop reporting that Clarke was violating clients' rights and to comply with Clarke's directive that Gill assist her in violating their rights.

189.    When Gill did not agree to stop reporting clients' rights violations, and indicated that she would not follow Clarke's directive that she violate clients' rights, Clarke decided to fire her.

190.    When Gill was fired, Defendants failed to pay her $200 for the medical tax exemption payment for the month of September 2017. Defendants also failed to pay Gill for four weeks of accrued vacation at the time of her termination.

191.    Through counsel, Gill sent a demand letter for these payments to TBC on about September 29, 2017.

192.    Defendants violated the FCA by knowingly presenting, or causing to be presented false claims for payment or approval to Medicaid/Medicare for services.

193.    Defendants violated the FCA by retaliating against Gill for reporting to Defendants and to DHHS that Defendants were submitting false claims for services.

194.    Defendants violated the FCA by retaliating against Gill for opposing what she believed to be fraud and by taking actions that could reasonably lead to a viable FCA action.

195.    Defendants terminated Gill for reporting what she reasonably believed to be violations of law, practices that endangered the health and safety of TBC's consumers, and deviations from the applicable standard of care.

196.    Defendants terminated Gill for refusing to execute unlawful directives.

197.    Defendants violated the MWPA as enforced through the MHRA when it terminated Gill.

198.    The timing of events, the shifting reasons offered for Gill's termination, Defendants' after-the-fact rationalizations, and the evidence of unlawful motive establish that the real reason for Gill's termination is not the reasons given by Defendants but instead because Gill engaged in protected activity.

## COUNT I: FCA

199.    Paragraphs 1-198 are incorporated by reference.

200.    Defendants' conduct violates the FCA.

## COUNT II: MHRA and MWPA

201.    Paragraphs 1-200 are incorporated by reference.

202.    Defendants' conduct violates the MWPA as enforced through the MHRA.

## COUNT III: MCE

203.    Paragraphs 1-202 are incorporated by reference.

204.    Defendants' conduct violates the MCE.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court grant the following relief:

(a)    Declare the conduct engaged in by Defendants to be in violation of her rights;

(b)    Enjoin Defendants, their agents, successors, employees, and those acting in concert with it from continuing to violate Plaintiff's rights;

(c)    Order Defendant(s) to employ Plaintiff in her former position;

(d)    Award equitable-relief for back pay, benefits and prejudgment interest;

(e)    Award compensatory damages in an amount to be determined at trial;

(f)      Award punitive damages in an amount to be determined at trial;

(g)      Award civil penal damages in an amount to be determined at trial;

(h)      Award liquidated damages in an amount to be determined at trial;

(i)      Award nominal damages;

(j)      Award attorney's fees, including legal expenses, and costs;

(k)      Award prejudgment interest;

(l)      Permanently enjoin Defendants from engaging in any employment practices that retaliate against persons who report violations of local, state and federal laws;

(m)      Require Defendants to mail a letter to all employees notifying them of the verdict against them and stating that Defendants will not tolerate retaliation in the future;

(n)      Require that Defendants post a notice in all of its workplaces of the verdict and a copy of the Court's order for injunctive relief;

(o)      Require that Defendants train all management level employees on the protections afforded by the MHRA, MWPA and FCA;

(p)      Require that Defendants place a document in Plaintiff's personnel file which explains that Defendants unlawfully terminated her because of retaliation; and

(q)      Grant to Plaintiff such other and further relief as may be just and proper.


Dated:  December 12, 2018                    */s/* Chad T. Hansen
                                             chansen@maineemployeerights.com
                                             Attorney for the Plaintiff

                                             MAINE EMPLOYEE RIGHTS GROUP
                                             92 Exchange Street 2nd floor
                                             Portland, Maine 04101
                                             Tel. (207) 874-0905
                                             Fax (207) 874-0343